LESTER, Plaintiff in error, vs. THE STATE, Defendant in· error.

*May 20—September 13, 1938.*

632

For the plaintiff in error there were briefs by *Edward Meyer* of Manitowoc and *G. F. Clifford* of Green Bay, and oral argument by *Mr. Clifford, Mr. John R. Delaney* of Green Bay, and *Mr. Meyer*.

For the defendant in error there were briefs by the *Attorney General* and *John R. Cashman,* district attorney of Manitowoc county, and oral argument by *Mr. Cashman* and *Mr. J. E. Messerschmidt,* assistant attorney general.

The following opinion was filed June 21, 1938:

ROSENBERRY, C. J.  The case was very thoroughly, carefully, and exhaustively tried at the circuit.  There are some six hundred thirty pages of testimony.  We shall not make a detailed statement of the facts but outline them sufficiently to present the questions here for decision.

Earl Lester, the deceased, was a fairly muscular man, five feet six inches in height, weighing about one hundred thirty-five pounds, and forty years of age. The defendant was married to Earl Lester in 1922, at Buffalo, New York. She was somewhat shorter in stature than her husband, but her age, her weight, and physical appearance do not appear from the evidence. At the time of their marriage Earl Lester was a taxi driver. Shortly thereafter she became suspicious with respect to her husband's health, and eventually learned that he was taking treatments for syphilis. They moved to Chicago about 1926, and from time to time he suffered, according to her evidence, from the disease, and had occasional spells of mental disturbance. These are not very well described, but she testifies that on a number of occasions he acted peculiarly. There was considerable dispute in the evidence as to the extent of damage done by syphilitic attacks. So far as the evidence discloses the deceased did not follow any regular occupation, but was engaged in running taverns and working for others at irregular intervals. The defendant also testifies that her husband made a number of attacks upon her. One time he choked her very severely, made threats against her which made her afraid of him. They had one daughter Margaret, who at the time of the trial was fourteen years of age. For some time, just how long before his death it does not appear, Lester had been associating with a woman by the name of Kasha Newberger. At one time the defendant returned to her home and found the clothes of Kasha in her room, and other evidences of it being occupied by Lester and Kasha as husband and wife. In January she was employed at Antigo, and while there had a severe attack of flu and returned to Manitowoc. She remonstrated with Lester, whereupon he threatened to kill her, and she went to a police officer for protection. On one occasion she was taken by an officer to her home because she

was fearful she might be followed and injury done her by Lester. She finally complained to the authorities, and was advised that she should have her husband sent to a psychopathic ward at Madison for treatment. She was disturbed by reason of Lester's relations with Kasha, but her objective in that respect was to get rid of Kasha and not to get a divorce from her husband. She consulted an attorney and was advised to get direct evidence of his relations with Kasha. For that purpose she employed a taxicab driver and followed them on one occasion but did not find them. She then inquired how she could get a permit to carry a gun, and was advised to see the municipal judge. She went to the city hall to see him but did not find him in. She then went to a hardware store and purchased a revolver which was a .32-short Harrington & Richardson double-action, solid-frame revolver. She also purchased a box of cartridges .32 short, manufactured by Smith & Wesson. Shortly after the purchasing of the revolver she saw her husband sitting in their car. Her husband charged her with having been to see the district attorney, which she denied and explained to him that she was going to take the bus to Green Bay. He offered to drive her over and on the way they had a good deal of argument. They visited their daughter and took her to dinner at a restaurant there. He promised to give up Kasha and to provide a home for the defendant and their daughter. Thereafter the deceased drove the defendant back to Manitowoc. The next morning, Saturday, February 13th, they met. He again accused her of having been to the district attorney's office, and told her that he would not give Kasha up, and that she might go to hell. She did not think that he was mentally right. She saw him again on Saturday when he threatened her with violence and told her that he would kill her if she ever mentioned Kasha's name again. In some way she learned that he was to meet Kasha

that night, and she had friends of hers drive her to hotels in Manitowoc and Two Rivers, in search of her husband and Kasha. Although she found places where they had been registered she did not overtake them. They returned to Manitowoc at about 3 o'clock Sunday morning. She then asked her friends to drive her to Green Bay, as she thought she knew where they probably were. They finally came to the Farm Tavern located about three miles south of Green Bay and there the Lester car was standing. She requested her friends to drive her to the sheriff's office which they did, arriving there about 6:30 o'clock Sunday morning. She told the sheriff that she wanted her husband arrested because he was with another woman. The sheriff and a deputy went with her to the tavern. The Lester car was still there. The proprietor at first denied but finally admitted that Lester was there. The defendant and the deputy sheriff went with the proprietor upstairs where they found Lester and Kasha in bed. Kasha begged not to be arrested, and promised that if the defendant would desist she would leave the country. After some discussion during the course of which the defendant asked Kasha to ride back to Manitowoc with them, it was arranged that the proprietor would drive Kasha back so she could get her belongings and leave Brown and Manitowoc counties for good. It was arranged that the Lester car should follow the other car, but when Lester backed his car around, he backed the car into a snow bank so firmly he could not get it out without help. He and the defendant went across the street, procured assistance, and finally the car was released, Mrs. Lester paying the charges of $1, and Mr. and Mrs. Lester departed in the Lester car for Manitowoc. This was about 9 o'clock in the morning of February 14th. He was in the driver's seat. She was in the back seat on the right side, a place she took by his direction. They had proceeded some fifteen or six-

teen miles and across the line into Manitowoc county. During the time they were covering this distance she says he was continually threatening her, accusing her of having the sheriff come, as a result of which the whole matter would be given wide publicity, he would be unable to get a job, and finally he drove the car to one side of the road and stopped. She said he threatened to kill her and started to reach over the back seat whereupon she took the revolver out of her purse. He grabbed her hand with his left hand and they engaged in a struggle. He had pulled her hand with the revolver up over the back of the front seat. She felt her grip loosening, put her left hand on his head to push him away and pulled with her right hand which held the revolver with all her strength. In the struggle the revolver was discharged and the bullet struck the deceased about one and one-fourth inches back of the angle of the right jaw and three fourths of an inch above, pursued a slightly downward course and came out on the left-hand side just below the jawbone, the bullet then striking the glass in the no-draft ventilator. During the course of the struggle one of the cartridges was released from the revolver, and was subsequently found near the left end of the front seat between the seat cushion and the back cushion. The defendant says that at the time she was not aware that the revolver was discharged. Lester opened the door on the left side of the car, got out and started to walk back toward Green Bay. She got out of the car and started following him. He turned to look at her, and she saw blood coming out of his mouth, whereupon she said she would go for a doctor. He walked six or seven rods and dropped dead. She then drove the car about a mile to the Straka farm which was situated on the east side of the road. She went into the house, asked Mrs. Straka to call a doctor, and she telephoned to the sheriff who came to the Straka home in about a half hour. The sheriff testified that when he asked the defendant how it happened,

she told him, "I did it. He was no good." Later she told the sheriff that the gun was at the north end of the culvert which was crossed by the driveway leading from the road to the Straka home. The revolver was subsequently found in the snow at the place she indicated. The defendant was then placed under arrest and taken to Manitowoc by the sheriff.

The evidence discloses quite clearly that the deceased was not kind to the defendant. She turned over her wages to him. So far as the evidence discloses she was the main support of the family, at least in recent years. While she left him when he was in Buffalo and went to Chicago, as soon as he recovered his health he came to Chicago and since that time they were never separated for any considerable length of time. There had been a good deal of trouble over the Kasha woman. She was ordered by her husband to leave the place where he lived and procured a room at the hotel two or three days before the killing. The defendant at one time had been convicted of keeping a disorderly house, having pleaded guilty and paid a fine.

At the close of the trial the court submitted verdicts of not guilty, first-degree murder, second-degree murder, third-degree manslaughter, and fourth-degree manslaughter. The jury returned the verdict of guilty of murder in the second degree. The defendant was sentenced to the Wisconsin prison for women for the term of not less than fourteen years nor more than seventeen years. The writ of error is sued out to review the judgment, which was entered July 6, 1937.

In this court it is contended that the judgment should be reversed upon four grounds:

"(1) The court erred in refusing to set aside the verdict for the reason that there existed a reasonable doubt as to defendant's guilt of murder in the second degree; (2) the court erred in refusing to grant a new trial for the reason

that finding the defendant guilty of second-degree murder was against the weight of the evidence; (3) as a matter of law, the defendant was not guilty of more than manslaughter in the third degree; and (4) that the court erred in its instructions to the jury."

The errors assigned may be considered under these four heads. The events leading up to the killing of the deceased cover a period of fifteen years. To make a full and complete recital of all of the evidence bearing upon the question of defendant's guilt or innocence would amount to abstracting the record. While the court gives careful and thorough consideration to every case, it is especially careful and thorough in cases involving capital offenses. While the case is not without its difficulties, the court is convinced that the trial court correctly held that the evidence would have sustained a conviction of murder in the first degree.

On behalf of the defendant it is urged that the statements of what happened in the car on the fatal morning made by the defendant are uncontradicted and that such statements cannot be eliminated from the case. That may be true as a proposition of law, but that does not amount to a holding that the jury must accept her statements as true. The guilt or innocence of the defendant must be determined upon the whole record, including her statement. There are many considerations that weigh in favor of the defendant. No doubt she was very fond of her husband. She had stood for much mistreatment from him. He had not supported her or made a home for her and their daughter. Nevertheless her love for him seems to have persisted. The situation is complicated by reason of the fact that the daughter was reaching an age when if she was to be saved from leading the kind of life her parents had led something must be done. The deceased took no responsibility in this matter. In fact he cast her off for another woman, but even this did not destroy her

affection for him because the evidence clearly shows that she was not trying to get rid of her husband, but to eliminate the woman, Kasha, from the scene. There are some circumstances which corroborate her statement of what happened in the car. It is apparent that the car was not in motion at the time of the shooting. Blood stains indicate the truth of her statement that he got out of the car and walked back. The fact that a loaded cartridge was found on the front seat and that one chamber of the revolver was empty corroborate her statement that there was a struggle because unless the cylinder was moved the cartridge could not fall out and her hand must have been over the back of the front seat. The revolver must have been pointed upward at the time else the cartridge would not have fallen out. There were scratches upon her hands which might have been made by the deceased's fingers. The fact that she immediately called the sheriff and attempted to summon aid is in her favor. He was permitted, however, to lie in the road where he fell on a cold February day for something like an hour before she returned to the scene. While she claims that she did not know that the revolver was discharged she testifies that he was bleeding at the mouth, and she must have had some reason to suppose that he was seriously injured or she would not have left him on a cold day on the public highway without immediate aid.

It is argued with a great deal of force that the defendant was greatly concerned for the welfare of the daughter, and that she would not have brought lasting disgrace upon her daughter by killing her husband, the father of the child. This and many other circumstances of less significance weigh in favor of the defendant. The jury might, however, well have doubted that she was afraid of him. She had pursued him on two or three occasions under circumstances quite likely to lead to trouble. He did not pursue her, she

pursued him. She drove to Green Bay on a cold winter night to rout him and his paramour out of bed. She could have caused the arrest of him and the woman Kasha, but did not do it for the reason that she hoped for a reconciliation, and that Kasha would be eliminated. The circumstance which weighs most heavily against the defendant was the fact that she purchased the revolver only two days before while living at a hotel away from her husband; that she pursued him as already indicated but relented and did not have him arrested when he promised to give Kasha up. The most significant circumstance was the fact that when asked by the sheriff how it happened she replied: "I did it. He was no good." It does not appear when she first told the story about the struggle in the car. There is no evidence that she said anything about it to the sheriff or anyone else at or near the time of the homicide. If she had immediately disclosed the fact that the act was committed in defending herself, and had given an account of the struggle, the jury might very probably have taken an entirely different view of the case. It is circumstances of that kind that often point convincingly to the truth in a case. She was apparently at all times in command of her faculties. The fact that the deceased was shot from the back is also a highly significant circumstance, and one which no doubt had great weight with the jury. There are other circumstances which weigh against the defendant.

The court is obliged to come to the conclusion that the evidence presented a jury question as to whether or not the defendant was guilty of any of the degrees of murder or manslaughter submitted by the court to the jury and that the evidence would have sustained a conviction of the defendant of murder in the first degree. The summary we have given is incomplete and does not present a perfect picture of the facts in the case, but it is sufficient to indicate the reasons which lead the court to its conclusion.

Coming now to the matter of instructions, on behalf of the defendant it is argued that the defendant was prejudiced by the manner in which the court submitted the verdict to the jury. The court first instructed the jury to consider whether the shooting was justifiable or excusable. It then submitted the verdicts as heretofore stated. It is argued on behalf of the defendant that because there is nothing to show that the jury ever considered third-degree manslaughter and the court made no mention of heat of passion in connection with its instruction relating to murder in the second degree, the defendant was prejudiced. It is considered that this position is not well taken. The instruction with respect to the elements of murder in the second degree are full and accurate. The jury were instructed fully upon the term "heat of passion," in connection with self-defense and excusable homicide, to which they were directed by the court to give their first consideration. The court repeated the instruction with respect to heat of passion in connection with manslaughter in the third degree, and the jury were instructed that if the defendant killed the deceased by the use of a dangerous weapon in the heat of passion without intent to kill, and that the killing was not justifiable or excusable, the defendant should be found guilty of manslaughter in the third degree, and that if they did not so find, the defendant could not be guilty of that offense. Under the instructions of the court, although the verdict was submitted in the order named, the jury must have had clearly in mind the fact that the defendant could not be convicted of murder in the second degree if the act was committed in the heat of passion. The jury were not told by the court that in their consideration of the verdict they should confine themselves while they were considering the matter of murder in the second degree solely to the instructions given in that connection. The court merely directed an orderly procedure and one which is customarily followed in cases of this kind. Instructions less

favorable to the defendant might have been given and still have been clearly within the rule. The trial court was evidently very cautious with respect to the instructions and gave the defendant the benefit of all doubt.

The defendant requested instruction upon excusable and justifiable homicide. Sec. 340.30, Stats., provides:

"Such homicide is excusable when committed by accident and misfortune in lawfully correcting a child or servant, or in doing any other lawful act by lawful means with usual and ordinary caution and without any unlawful intent; or by accident and misfortune in the heat of passion upon any sudden and sufficient provocation, or upon a sudden combat, without any undue advantage being taken and without any dangerous weapon being used, and not done in a cruel or unusual manner."

The court instructed the jury as follows:

"If you find that Earl Lester made an assault on the defendant and the defendant feared or believed and had reasonable ground to fear or believe that her husband would commit a felony upon her or do her some personal injury, then she had a right to defend herself against such assault by lawful means with usual and ordinary caution and without unlawful intent. If that was the situation, then the defendant had a lawful right to seize her revolver while she was in the automobile for the purpose of defending herself therewith, and if while having the revolver in her hand for the purpose of defending herself, the defendant by accident and misfortune shot the deceased without intending to do so, or if in the scuffle the revolver then discharged accidentally while the defendant was exercising usual and ordinary care in handling it, then the killing of the deceased was excusable and you should find the defendant not guilty."

This part of the instruction was no doubt intended to cover the first part of sec. 340.30, Stats. The court then continued:

"The defendant had a right to have in her hand and aim the revolver at or toward her husband for the purpose of

preventing him from making an assault upon her. If such assault was committed, this was a lawful means of defense and if while so doing the revolver was discharged and as a result thereof the deceased was killed by accident and misfortune while the defendant was in the heat of passion, then the killing was excusable, and if you so find you should find the defendant not guilty. In the preceding paragraph the words 'heat of passion' are used. These words are defined as follows :" (Here follows a full and correct definition of heat of passion.)

It is contended on behalf of the defendant that this instruction places an additional burden upon the defendant because if the act was committed while she was defending herself the accidental discharge need not be in heat of passion. That is entirely true, and that is the situation dealt with in the first paragraph quoted above. It is argued that an act in the heat of passion is a voluntary act, and that the element of accident referred to in the instruction is a thing that is entirely involuntary, and for that reason the instruction is confusing and erroneous. The language of the statute is—

"Such homicide is excusable when committed by accident and misfortune . . . in the heat of passion upon any sudden and sufficient provocation," etc.

The instruction of the court is that if the deceased was about to assault the defendant, she had a right to have in her hand and aim the revolver at or toward her husband for the purpose of preventing him, and if while so doing the revolver was discharged and the deceased was shot by accident and misfortune while the defendant was in the heat of passion, then the killing was excusable. It is considered that the instructions are a correct statement of the law as applied to this case. The jury were plainly told that if the defendant feared, or had reasonable grounds to fear her husband, she had a lawful right to seize her revolver for the purpose

of defending herself, and that if it was discharged and by accident and misfortune the deceased was killed, the homicide was excusable whether she was or was not in the heat of passion.

The defendant did not testify to a state of facts which would justify the conclusion that she intentionally shot the deceased in self-defense or otherwise. She claims she did not know the revolver was discharged until her husband started to get out of the car. If her story be taken as true, the revolver was accidentally discharged whether she was in a heat of passion or not. There was no need for the court to instruct the jury upon a supposititious state of facts.

Complaint is made in regard to the following instruction:

"Her attorney stated in his opening statement to the jury that the defense would be that the defendant acted in self-defense but the defendant testified that she reached for the revolver in her purse and turned with it toward or in the direction of the deceased, and that in the scuffle between them the revolver was accidentally discharged. The court instructs you that these claims are inconsistent and that you cannot find this defendant not guilty on the ground of justifiable homicide, which means self-defense, and also on the ground of excusable homicide, that is, on the ground that the revolver was discharged accidentally."

We discover no inconsistency in this instruction. As already pointed out, the defendant nowhere testified that she shot in self-defense or that she shot at all. Her claim was that the revolver was accidentally discharged during a scuffle between her and her husband. She had a right to have possession of the revolver and to point it at the deceased in order to defend herself, and under proper circumstances she would have been justified in deliberately discharging it, but there was no evidence that the revolver was so discharged. Defendant's counsel do not distinguish between shooting in self-defense and having a revolver in one's possession for the purpose of self-defense.

Defendant made a motion for a new trial on the ground of newly-discovered evidence. The court denied the motion on the ground that the evidence was cumulative and that there was a lack of diligence on the part of defendant in obtaining the testimony. This is a matter largely in the discretion of the trial court, and there are no grounds upon which it can be said that the trial court abused its discretion in denying the motion.

*By the Court.*—Judgment affirmed.

FAIRCHILD, FRITZ, and MARTIN, JJ., dissent.

A motion for a rehearing was denied, without costs, on September 13, 1938.